UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SHANA E. CANNELL,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CORIZON, LLC, (formerly known as Corizon, Inc., and Correctional Medical Services, Inc. and also known as Corizon Health, Inc.)<br><br>BRIAN CASTONGUAY,<br><br>LARRY BRAYHALL, and<br><br>TAMMY HATCH.<br><br>　　　　Defendants. | Docket No.: |

**COMPLAINT AND DEMAND FOR JURY TRIAL
AND INJUNCTIVE RELIEF SOUGHT**

**SUMMARY OF THE ACTION**

　　1.　　While working as an LPN at the Maine State Prison, Cannell was subjected to a hostile and abusive work environment because she is black. For example, Defendant Larry Brayhall repeatedly made racist comments to her, including use of the "N" word. Cannell made numerous reports – both in writing and in person – to her mangers, including Defendants Castonguay and Hatch about the ongoing racial harassment and discrimination. But her managers failed to take appropriate corrective action and instead retaliated against her by subjecting her to less favorable work conditions. Within weeks of her most recent complaint about the ongoing race discrimination, she was unfairly fired based on the false charge of

sleeping on the job even though her employer knew that this allegation was false. On the same day that he fired her, Cannell's supervisor complained to her about her race discrimination complaints. As a result of Defendants' intentional discrimination and retaliation, Ms. Cannell is seeking all available remedies, including back pay and benefits, compensatory damages, punitive damages, injunctive relief, and attorney's fees and expenses.

## PARTIES

2. Plaintiff Shana Cannell is a citizen of the United States and is currently a resident of St. Louis, Missouri.

3. Defendant Corizon, LLC (formerly known as Corizon, Inc., and Correctional Medical Services, Inc. and also known as Corizon Health, Inc.) provides healthcare services at correctional facilities throughout the United States. It will be referred to in this Complaint as CMS or Employer.

4. Defendant Brian Castonguay was the Director of Nursing employed by CMS at the Maine State Prison while Cannell worked there in 2010.

5. Defendant Larry Brayhall was a nurse employed by CMS at the Maine State Prison while Cannell worked there in 2010.

6. Defendant Tammy Hatch was the Health Service Administrator (HAS) employed by CMS at the Maine State Prison while Cannell worked there in 2010.

## JURY TRIAL DEMAND

7. Under Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues triable to a jury.

## JURISDICTION AND VENUE

8. This action arises under 42 U.S.C. § 1981 as amended. This Court has proper

subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1341 (federal question) and 1343 (civil rights).

9. Venue is proper in the District of Maine under 28 U.S.C. § 1391(b) (2) because a substantial part of the events or omissions giving rise to the claim occurred in Maine. Under Rule 3(b) of the Rules of this Court, this action is properly filed in Portland because the events at issue occurred in Knox County.

## FACTUAL ALLEGATIONS

10. As of February 2010, CMS had a contract with the Maine Department of Corrections to provide healthcare services for the Department of Corrections in all of its correctional facilities.

11. Cannell began working for CMS on February 9, 2010. Cannell was employed by CMS as a full-time Licensed Practical Nurse at the Maine State Prison in Warren, Maine, which is in Knox County.

12. Cannell was hired by Tammy Hatch, CMS's HSA. Her immediate supervisor was the Director of Nursing, Brian Castonguay.

13. Beginning in March 2010, Castonguay refused to schedule Cannell for mandated training sessions despite her requests to receive such training.

14. Near the end of May, 2010, some of the staff, including captains and sergeants, came to suspect that Cannell was dating a white male corrections officer.

15. These staff members then began to harass Cannell her on a daily basis with derogatory comments. One sergeant even hit Cannell in the arm.

16. The derogatory racial comments included the following:

- "Shana, my grandmother had a black dog when I was a kid. Its name was ni— er."

3

- "fat ni—er bi-ch"
- " your people know how to barbecue chicken"
- "I can be the fried chicken and you can be the watermelon"
- "I am an honkey and am proud to be a honkey"
- what does the confederate flag mean to you
- cleaning up messes "is what your people do"
- "of course your people like chocolate, a chocolate for a chocolate"
- "your people like black coffee"

17. Beginning in early June of 2010, Cannell made numerous reports – in writing and in person – to Castonguay and Hatch about the racial harassment and discrimination.

18. Defendants orchestrated and condoned a continuing campaign of harassment against Cannell because of her race and in retaliation for her opposition to the unlawful race discrimination and harassment in the workplace. These acts of discriminatory and retaliatory harassment included:

- Ordered to clean up a bio-hazard
- Not being protected when an inmate made serious and repeated threats against her personal safety
- the ransacking of her car with no corrective action or proper follow up after she promptly reported the incident to Castonguay and Hatch
- being disciplined for missing work when the absence has been pre-approved by a manager
- being denied paid time off when it was being granted to others nurses under the same circumstances
- being reprimanded for breaks when other staff were allowed to take longer breaks under similar circumstances

19. Defendants' harassment of Cannell was severe and pervasive, unreasonably interfered with her work performance, and had had major adverse effects on her psychological well-being.

20. On about July 25, 2010, Cannell was seriously injured in a boat accident that caused acute trauma to her head and neck.

21. In September 2010, Cannell was still suffering serious symptom from the July 25 accident.

22. Cannell met with Hatch during the first or second week of September 2010.

23. In that meeting, Cannell explained that her symptoms had become exacerbated so that she could have an immediate need to lay down at work to relieve her symptoms.

24. Hatch responded that "just do whatever you need to do, but we need you here at work."

25. In that meeting, Cannell also reported new incidents of racial harassment involving derogatory comments by Sargent Giffords, including "of course your people like chocolate, a chocolate for a chocolate" and "your people like black coffee."

26. In that meeting, Cannell asked Hatch about the status of Cannell's earlier complaints about race discrimination and harassment.

27. In reply, Hatch said "they are still being investigated. You're just going to have to deal with it. You set people up to say these things."

28. Cannell replied that she should not have to deal with any harassment, let alone ongoing harassment, and walked out of Hatch's office.

29. A few minutes later, Hatch came to the clinic area and apologized to Cannell.

30. Hatch said that we need to set up a meeting with Deputy Warden Leida Dardis and that Dardis does not need all the details but "just a week of how it feels to walk in your shoes."

31. Hatch soon went out on leave and the meeting she promised with the Deputy Warden never occurred.

32. On October 13, 2010, Castonguay called Cannell to his office and showed her

still pictures of Cannell putting her head down on the desk at work on September 26, 2010.

33. Castonguay asked Cannell if she had been sleeping and Cannell firmly told him that she had not been sleeping.

34. Cannell explained to Castonguay that due to severe back pain, she had laid down on the desk in order to stretch her back and help relieve the pain.

35. Cannell also explained that Hatch had specifically authorized Cannell to lay down at work to relieve her back pain symptoms.

36. Cannell also filled out a written report unequivocally confirming that she had not been sleeping at work on September 26, 2010.

37. The security officer on duty also completed a report on October 13, 2010 for Castonguay confirming that Cannell had not been asleep at any time on September 26, 2010.

38. On October 14, 2014, a sergeant who was working at the prison told Cannell to request that Castonguay show her the videotape of the September 26 incident because it proves that she was not asleep.

39. This sergeant further told Cannell that she needed to get the videotape immediately because they only keep these videotapes during a 17-day window.

40. At the end of her shift on October 14, Cannell went to Castonguay and asked him to let her view the video and for a copy of the video.

41. Castonguay replied "Oh, I did review it and I know you were not asleep, but this is still being considered an incident of lack of situational awareness."

42. Cannell protested that she did not even know what situational awareness was and that she never had the mandated formal training at the prison.

6

43. Castonguay said that this was out of his hands and that CMS would be making the final decision due to this lack of situational awareness.

44. While Cannell continued to protest that she was being treated unfairly, Castonguay started to discuss her reports of racial discrimination and harassment at work. He brought up the incident when her car was ransacked at work and said that she should have reported it sooner.

45. Soon after she arrived home from work on October 14, 2010, Cannell answered the phone.

46. It was Castonguay and he told Cannell that CMS has decided to terminate her employment due to lack of situational awareness.

47. Cannell's last day of work for CMS was October 14, 2010.

48. CMS's official personnel file for Cannell includes a memorandum from Brian Castonguay dated October 18, 2010 to CMS's Regional Manager.

49. This memorandum's stated subject matter is "Recommendation for Termination" regarding employee Shana Cannell.

50. This memorandum states in part as follows: on September 26, 2010, Cannell "was observed laying on the nurse's station desk appearing to be sleeping at Maine State Prison. The incident lasted for a total of 14 minutes and was captured on security video. Ms. Shana Cannell did this while a maximum-security prisoner was inside the clinic area, which placed herself and her co-workers at substantial risk."

51. This memorandum is signed by CMS's Regional Manager, who dates his signature to be on October 18, 2010.

52. By letter dated November 1, 2010, CMS notified Cannell that she was employed by CMS as a Licensed Practical Nurse at the Maine State Prison from February 9, 2010 through October 15, 2010.

53. This letter from CMS to Cannell further states that "[y]our employment was terminated because you were sleeping on duty while a maximum security inmate was inside the clinic area."

54. This letter was signed by the Assistant Director of Human Resources for CMS.

55. While Cannell rested in the clinic area on September 26, 2010, the inmate who was inside the clinic area was unable to walk or move by himself due to morbid obesity.

56. In an October 27, 2010 written statement to the Maine Department of Labor, CMS falsely claimed that Cannell was discharged for violating the employer's narcotic control and professionalism policy.

## **LEGAL CLAIM**

57. The allegations in paragraphs 1-56 are realleged.

58. As a direct and proximate result of Defendants' intentional discrimination against Cannell because of her race and retaliation against Cannell because of her opposition to and complaints about race discrimination, she has suffered and will continue to suffer damages, including, but not limited to, back pay and benefits, humiliation and embarrassment, emotional pain and distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, and other pecuniary and non-pecuniary losses.

59. Plaintiff requests relief against Defendants as follows:

  (a) Enter declaratory relief that Defendants violated Plaintiff's statutory civil rights to be free of race discrimination and unlawful retaliation;

(b) Enter injunctive relief ordering Defendant CMS to provide training to its management officials regarding their legal obligations to respond promptly to complaints of race discrimination and harassment in the workplace

(c) Award Plaintiff back pay for lost wages and benefits and prejudgment interest thereon and reinstatement, or, in lieu thereof, front pay for future lost wages and benefits;

(d) Award compensatory damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(e) Award punitive damages in amounts to be determined at trial by the jury and prejudgment interest thereon;

(f) Award Plaintiff full costs and reasonable attorneys' fees; and

(g) Award such further relief as is deemed appropriate.

Respectfully submitted,

Date: October 14, 2014

/s/ David G. Webbert
David G. Webbert
JOHNSON & WEBBERT, L.L.P.
160 Capitol Street, P.O. Box 79
Augusta, Maine  04332-0079
Tel:  (207) 623-5110
E-Mail: dwebbert@johnsonwebbert.com

Attorney for Plaintiff Shana E. Cannell